UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YAZAKI NORTH AMERICA, INC.,

        Plaintiff,                    Case Number 16-11459
                                              Honorable David M. Lawson

v.

JOHNSON CONTROLS, INC.,

        Defendant.

_____/

**OPINION AND ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT**

When defendant Johnson Controls, Inc. discovered information that led it to believe plaintiff Yazaki North America, Inc. had been overcharging it over a four-year period for wire harnesses under an automotive supply contract, Johnson Controls withheld payment of over $600,000 from later deliveries. This lawsuit followed. The parties filed cross motions for summary judgment, believing that the dispute could be decided as a matter of law. The record, however, suggests that factual disputes remain, which prevent a resolution at this stage of the case. Therefore, both motions for summary judgment will be denied.

I.

The complaint states a simple breach of contract claim: Yazaki alleges that it furnished automotive parts to Johnson Controls, for which Johnson Controls failed to pay to the tune of $636,688.92.

The parties have stipulated to *most* of the facts. Johnson Controls supplied seats to automotive manufacturer Fiat Chrysler Automotive, now known as FCA US LLC. Yazaki entered into a contract to furnish wire harnesses to Johnson Controls to be included in the seat assemblies. The specifications for Yazaki's wire harnesses had to be approved by Chrysler. In fact, it appears

that Yazaki negotiated the supply contract directly with Chrysler, which directed Johnson Controls to integrate the parts supplied by Yazaki. Chrysler later issued a change order that likely reduced the cost of certain wire harnesses. Yazaki continued to charge Johnson Controls the original contract price.

The initial supply agreement was dated May 6, 2010. It set out the prices for each of ten wire harnesses to be incorporated into seat assemblies, and it incorporated a lengthy set of terms and conditions drafted by Johnson Controls. Production and deliveries were triggered by separate purchase orders. The agreement identified each wire harness by a Johnson Controls part number and a description that lists certain components. One of the components of four of the harnesses is identified as "STPS," which signifies a "seat tracking position sensor." It appears that a design specification called for wire harnesses with that designation to include a branch that would energize a STPS.

On June 30, 2010, JCI issued the original purchase order that included wire harnesses at the agreed upon price per unit. Later, however, Chrysler issued an interim approval authorization (IAA) to allow Johnson Controls to build seat assemblies from August 24, 2011 to October 31, 2011 with wire harnesses that did not contain the STPS components. It appears that Chrysler and Yazaki had discussed this change beforehand, as the IAA reads: "THIS IAA IS TO ALLOW JCI TO BUILD JK PASSENGER SEATS WITH MODIFIED WIRE HARNESS WITHOUT STPS BRUNCH. THE RASON [sic] IS THAT WIRE HARNESS SUPPLIER YAZAKI PULLED THE CHANGE AHEAD."

In November 2011, Chrysler issued a change notice to the parties that made the removal of the STPS components final. Chrysler's stated reason for the change is somewhat cryptic. It reads:

"JK 2012. SEAT BELT AND VARIOUS COST SAVINGS AND NO COST CHANGES ONLY."
The change notice lists 11 changes, of which it appears that only changes six and nine are relevant in this case:

> 6    ELIMINATE THE BRUNCH OF THE WIRE HARNESS THAT IS CONNECTED TO THE STPS CONNECTOR ON PASSENGER SEAT - YAZAKI. – THIS CHANGE IS A RESULT OF THE ELIMINATION OF THE (STPS PASSENGER SEAT) – PER MCM#268984
> . . .
> 9    FOR CALL OF DUTY PASSENGER SEATS, ELIMINATE STPS SENSOR TWO STPS BRACKETS AND MODIFY WIRE HARNESS BY ELIMINATINGTHE [sic] STPS BRUNCH. – PER MCM#268984

It is difficult to determine which parts were affected by the change order. The change order does not specify part numbers. Chrysler's part numbers do not correspond to Johnson Controls's part numbers. The parties submitted a screen shot of what appears to be Chrysler's change notice tracking system that identifies which parts are to be changed using Chrysler's part numbering system, but those part numbers do not correspond to the Johnson Controls part numbers in the 2010 Supply Agreement or 2010 purchase order. The parties stipulate that the Johnson Controls part numbers that were affected were part numbers 2284897 and 2284900, again neither of which were part of the 2010 Supply Agreement or 2010 purchase order. Moreover, Johnson Controls changed its part numbers, but there is nothing in the record to tie the changes to the Supply Agreement or 2010 purchase order.

The parties agree, however, that from November 2011 through March 2015, Yazaki supplied certain wire harnesses that did not contain STPS branches, and Johnson Controls accepted the product.

On March 10, 2015, Johnson Controls delivered to Yazaki Purchase Order No. 55013788, Revision 32, dated March 4, 2015, which the parties stipulate decreased the price for certain wire

harnesses by $0.9026 per unit. That purchase order contained a revised set of terms and conditions. However, it is not clear from the parties' stipulation, or the 2015 purchase order, which part numbers were subject to the price reduction. The parties stipulated that between November 2011 and March 2015, Yazaki continued to invoice, and Johnson Controls continued to pay, the prices stated in the 2010 purchase order. Johnson Controls contends that this price reduction should have applied to the affected wire harnesses from the time of the change order in 2011. However, the record does not allow the parts to be tracked by part numbers or otherwise, and, based on the parties' stipulation of facts, it is not possible to determine whether there was an overcharge by Yazaki (and Yazaki has not conceded that it overcharged Johnson Controls); and even if there were overcharges, it is impossible to determine the amount of the overcharge based on the parties' stipulation and the attached contract documents.

The parties do agree on a few more points, however. For one, after Chrysler issued the 2011 IAA, Yazaki continued to manufacture the original wire harnesses using the same part number designated in the 2010 supply agreement, but with the STPS branches removed. Johnson Controls did not issue to Yazaki a new purchase order or any written instruction to reflect a price reduction for the wire harnesses until 2015. They agree that between November 2011 and March 2015 Johnson Controls knew that the Change Notice would result in a reduced cost for the wire harnesses. During that time, Johnson Controls did not request, and Yazaki did not provide, a revised price for the wire harnesses without the STPS branches.

Also, the parties agree that during that time, Yazaki knew that the STPS branches in the wire harnesses had been removed because of the Change Notice, and knew the cost of the removed STPS branches.

It was not until March 2015 that Johnson Controls first requested from Yazaki a price adjustment for past deliveries. That request was in the form of a debit against existing and future invoices of approximately $600,000. Johnson Controls calculated that amount as the actual price difference of $0.9026 per unit, which accounted for the removal of the STPS branches for all wire harnesses supplied by Yazaki to Johnson Controls between November 2011 and March 2015. On April 29, 2015, Johnson Controls debited payables to Yazaki by $636,688.92. That did not sit well with Yazaki, which filed its breach of contract action a year later.

II.

The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine

'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

Yazaki's claim is for breach of contract. The parties agree that Michigan law governs their dispute. Because this is a diversity action, the Court must follow Michigan substantive law, as prescribed by the state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). If the Michigan Supreme Court has not addressed a determinative point of law, this Court "must predict how it would resolve the issue from 'all relevant data.'" *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995) (citing *Bailey v. V. & O Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir. 1985)). "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the Michigan Supreme Court would decide otherwise." *Ibid.* (citing *FL Aerospace v. Aetna Casualty and Surety Co.*, 897 F.2d 214, 218-19 (6th Cir. 1990)).

Yazaki makes a straightforward argument that Michigan's version of the Uniform Commercial Code governs the parties' agreement and its provisions are dispositive in this case. Because the contract involves the sale of goods, Yazaki points to UCC section 2-607, codified at Michigan Compiled Laws § 440.2607, which requires a buyer to notify a seller of goods of any breach "within a reasonable time after he discovers or should have discovered" it. Failure to do so bars the buyer "from any remedy." MCL § 440.2607(3). Yazaki maintains that Johnson Controls waited an unreasonable time — 40 months — before notifying Yazaki of the purported overcharges. Therefore, it insists, Johnson Controls is barred from any recovery as a matter of law by section 2-607.

Johnson Controls makes four arguments in support of its position. First, it contends that Yazaki failed to identify the part of the agreement that was breached. Second, it argues that the UCC section 2-607(3)(a) does not apply because the parties specifically contracted around that section in the terms and conditions incorporated into the supply agreement and purchase orders. Third, Johnson Controls argues that Yazaki agreed to indemnify and hold Johnson Controls harmless from all losses and costs relating to any type of pricing issue. Fourth, Johnson Controls contends that Yazaki was the first party to breach the contract, and under Michigan law, the party who committed the first breach of contract cannot pursue a claim for a later alleged breach of contract.

A.

Johnson Controls's first argument is easily resolved. Yazaki's claim is for breach of contract. To state a claim for breach of contract under Michigan law, a plaintiff first must establish the elements of a valid contract. *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765, 453, N.W.2d 304, 307 (1990). The elements of a valid contract in Michigan are "'(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation.'" *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011) (quoting *Hess v. Cannon Twp.*, 265 Mich. App. 582, 696 N.W.2d 742, 748 (2005)). Once a valid contract has been established, the plaintiff then must prove (1) the terms of the contract, (2) breach of those terms by the defendant, and (3) injury to the plaintiff resulting from the breach. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003); *see also May v. CitiMortgage, Inc.*, 648 F. App'x 567, 571 (6th Cir. 2016)).

The parties do not dispute the existence of valid contracts. Each purchase order was a separate and agreed upon contract between the parties. Nor do they dispute that Yazaki was to

provide wire harnesses to Johnson Controls for a fixed price per unit. They also agree that Johnson Controls did not pay $600,000 to Yazaki for products Yazaki tendered to Johnson Controls. Failure to pay for goods sold and delivered is a clear breach of the contract. *Fisher Sand & Gravel Co. v. Neal A. Sweebe, Inc.*, 494 Mich. 543, 568, 837 N.W.2d 244, 259 (2013). Johnson Controls accepted the wire harnesses, and therefore was required to pay the contract price. Mich. Comp. Laws § 440.2607(1) ("The buyer must pay at the contract rate for any goods accepted."). And Yazaki has been harmed by not receiving payment for the goods it delivered to Johnson Controls. Therefore, absent provisions of the parties' agreement or a provision of the UCC that allowed Johnson Controls to engage in self-help for the alleged overcharges, Yazaki has established a valid claim for breach of contract.

B.

1.

Johnson Controls justifies its $600,000 setoff by its claim of overcharge by Yazaki. Yazaki says that UCC section 2-607(3)(a) precludes that claim. That sections reads:

> Where a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."

Mich. Comp. Laws § 440.2607(3)(a).

The parties' agreements involve the sale of goods; therefore, the agreements are governed by Article 2 of the Uniform Commercial Code. Mich. Comp. Laws §§ 440.2102 & 440.2105(1). Section 2-607 applies here because Johnson Controls alleges that Yazaki charged it a higher price for the goods than should have been allowed under the contract, and under this section, Johnson Controls was obligated to notify its seller of "any breach." *See Roth Steel Prods. v. Sharon Steel*

*Corp.*, 705 F.2d 134, 152 (6th Cir. 1983) (interpreting a notice requirement imposed by the Ohio Commercial Code that is identical to the Michigan provision). "Whether proper notice was given is a question of fact." *Standard All. Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir. 1978). But "[i]f reasonable minds could not differ, . . . the question of what constitutes a reasonable time should be decided on summary [judgment] as a matter of law." *Bev Smith, Inc. v. Atwell*, 301 Mich. App. 670, 682, 836 N.W.2d 872, 879 (2013).

2.

Johnson Controls counters that the parties expressly contracted around section 2-607(3). And subject to limitations not applicable here, a UCC provision "may be varied by agreement." Mich. Comp. Laws § 440.1302; *see also Hayward v. Postma*, 31 Mich. App. 720, 723, 188 N.W.2d 31, 32 (1971) ("The general approach of Article 2 of the code is that freedom of contract prevails; the greater part of it is concerned with detailing what happens where the contract is silent on a particular point."). In support of its contention, Johnson Controls cites the following language in the parties' agreements:

> Because Johnson Controls is considered only an integrator of the products supplied by [Yazaki] for this program, Johnson Controls will manage the supply chain but [Yazaki] and [Chrysler] will be directly responsible to one another for all commercial issues (such as pricing disputes), collection risk, warranty charges, product liability claims, (except to the extent caused by Johnson Controls) intellectual property matters and product interruptions. Johnson Controls will not be responsible for and will be indemnified against these matters. Any debits or surcharges claimed by [Yazaki] or [Chrysler] will be passed through Johnson Controls only after the written agreement of all three parties.

2010 Supply Agreement.

> As Johnson Controls is only an integrator of the products supplied by Supplier pursuant to this purchase order for the [Chrysler] JK program (the "Supplies"), Supplier agrees that Supplier and [Chrysler] will be directly responsible to one another for all commercial issues (such as pricing disputes), collection risk, warranty

-9-

> charges, product liability claims, intellectual property matters and production interruptions relating to the Supplies. Supplier agrees that Johnson Controls will not be responsible for and will be indemnified by Supplier against these matters. Any debts or surcharges claimed by Supplier will be passed through Johnson Controls only after the written agreement of all three parties.

2010 Johnson Controls purchase order at 4.

> If a Customer [such as Chrysler] directed, recommended, requested, suggested or otherwise identified [Yazaki] as the source from which [Johnson Controls] is to obtain the Supplies ('Direct Supply Relationship'), then notwithstanding the particular payment terms otherwise applicable to the Order or anything to the contrary in the Order: . . . (3) within three business days of any change in price, specifications or other terms negotiated or proposed between [Yazaki] and [Chrysler], [Yazaki] will notify [Johnson Controls] in writing and will immediately adjust its invoices to reflect any price reduction, provided that no change will be binding on [Johnson Controls] without [Johnson Controls's] specific written consent; …. (5) [Yazaki] will resolve all commercial issues (including pricing disputes), collection and/or insolvency risks of OEM and/or [Yazaki] warranty charges, product liability claims, recalls, intellectual property matters and production interruptions arising from or relating to the Supplies (except in each case to the extent caused by [Johnson Controls]) directly and exclusively with [Chrysler] and [Yazaki] will indemnify and hold harmless [Johnson Controls] for these matters.

Johnson Controls 2014 Terms and Conditions ¶ 15(c).

None of this language makes reference to section 2-607, nor does it amount to a substantive waiver of its provisions. Instead, these provisions relate to Johnson Controls's unique position as an integrator of automotive parts for Chrysler. The supply agreement between Johnson Controls and Yazaki recognizes that Johnson Controls has been directed by Chrysler to use automotive parts supplied by Yazaki. Therefore, because Johnson Controls is situated between Chrysler and Yazaki in this automotive supply chain, Yazaki agreed to notify Johnson Controls of any price changes or specification changes instigated by Chrysler or negotiated between Yazaki and Chrysler. However, there is nothing in the record that shows there was a price reduction for the wire harnesses, or any pricing disputes between Yazaki and Chrysler.

Chrysler issued a change notice revising the specifications of a number of the wire harnesses Yazaki provides to Johnson Controls. The changes were listed under the cryptic heading "SEAT BELT AND VARIOUS COST SAVINGS AND NO COST CHANGES ONLY." The parties stipulate that they both received the change notice, so there is no question that Johnson Controls had notice of the specification change. However, although the parties stipulated that there would be a *cost* reduction by removing the STPS branches from certain wire harnesses, there is no indication that the specification changes resulted in a corresponding *price* reduction. The change notice is ambiguous on that score. It is not clear which changes were "cost savings," and which changes were "no cost changes."

The quoted contract language establishes that if Yazaki and Chrysler negotiated a price reduction corresponding to the removal of the STPS component, then Yazaki was required to notify Johnson Controls immediately and reduce its price to Johnson Controls. However, there is no evidence in this record that such a negotiation ever occurred, and Chrysler's change notice does not shed any light on the subject. The Court cannot assume that the removal of the STPS component automatically entitled Johnson Controls to a corresponding price reduction for the cost of the part. There may be any number of other considerations at play. For example, Yazaki may have incurred costs for retooling to build wire harnesses without the STPS component. The record simply does not establish that there was a price reduction between Chrysler and Yazaki that would trigger any of the quoted provisions, or that the removal of the STPS component necessarily entitled Johnson Controls to a price reduction.

As a result, section 2-607(3) cannot be said to address the concerns reflected in the quoted language. Instead, section 2-607(3) deals with the notification a buyer must give to the seller of any

-11-

breach of the agreement between the parties, such as nonconforming goods, or, as here, overcharges. Imagine that Yazaki had notified Johnson Controls of a negotiated price reduction, but failed to implement the reduction on future purchase orders. Because Yazaki had agreed to pass on any price reductions, the failure to do so would amount to a breach of contract. Once Johnson Controls received a new invoice with overcharges, section 2-607(3) required Johnson Controls to bring the breach to the attention of Yazaki. The parties' agreements and section 2-607(3) serve different purposes and are not inconsistent. Although the quoted language protects Johnson Controls from price disputes that may arise between Chrysler and Yazaki, section 2-607(3) addresses other concerns, such as the underlying policy "to protect the seller from stale claims and provide certainty in contractual arrangements." *Am. Bumper & Mfg. Co. v. Transtechnology Corp.*, 252 Mich. App. 340, 346-47, 652 N.W.2d 252, 256 (2002) (citing in *Aqualon Co. v. Mac Equip., Inc.*, 149 F.3d 262, 269 (4th Cir. 1998)).

The parties did not expressly waive section 2-607(3). Under Michigan law, a "'[a] waiver is a voluntary relinquishment of a known right.'" *McDonald v. Farm Bureau Ins. Co.*, 480 Mich. 191, 204, 747 N.W.2d 811, 819 (2008) (quoting *Dahrooge v. Rochester–German Ins. Co.*, 177 Mich. 442, 451–452, 143 N.W. 608, 611 (1913)). "'A waiver may be shown by proof of express language of agreement . . . .'" *Bissell v. L.W. Edison Co.*, 9 Mich. App. 276, 287, 156 N.W.2d 623, 628 (1967) (quoting *Strom-Johnson Const. Co. v. Riverview Furniture Co.*, 227 Mich. 55, 67, 198 N.W. 714, 718 (1924)). As Yazaki points out, had Johnson Controls intended to contract around section 2607(3), it knew how to do so. Johnson Controls specifically contracted around the battle of the forms provision in section 2-207. Johnson Controls argues that section 2-207 requires express waiver. That may be so, but as noted above, waiver must be shown by express language in an

-12-

agreement, or language that at least is inconsistent with the statute. The parties' contract documents do not contain either.

3.

Johnson Controls also argues that the parties' agreements provide setoff and recoupment rights that allowed it to withhold the amounts representing the overcharges by Yazaki. The specific term reads:

> <u>Set-Off; Recoupment.</u> In addition to any right of setoff or recoupment provided by law, all amounts due to Seller will be considered net of indebtedness of Seller and its affiliates or subsidiaries to Buyer and its affiliates or subsidiaries. Buyer will have the right to set off against or to recoup from any payment or other obligation owed to Seller, in whole or in part, any amounts due to Buyer or its affiliates or subsidiaries from Seller or its affiliates or subsidiaries. Buyer will provide Seller with a statement describing any offset or recoupment taken by Buyer.

Johnson Controls Terms ¶ 27.

There is no question that Johnson Controls contracted for recoupment rights of any debt owed to it by Yazaki. However, Johnson Controls's argument rests on the assumption that the parties have agreed that Yazaki owes it a debt. There is no such agreement, and Johnson Controls has not established that fact. Yazaki disputes the point. The contractual right of setoff and recoupment alone do not avoid Yazaki's breach of contract claim.

4.

Johnson Controls argues that even if section 2-607(3) applies, Yazaki has not shown that it waited an unreasonable amount of time before notifying Yazaki of the alleged overcharges. Yazaki asserts that 40 months is an unreasonable delay of notice as a matter of law. Johnson Controls makes somewhat conflicting notice arguments. On the one hand, it argues that Yazaki unequivocally knew of the alleged price reduction in 2011 when it received Chrysler's change

notice. On the other hand, even though it received the same change notice in 2011, it argues that it did not become aware of the breach until 2015.

The first point — that notice was not necessary because Yazaki was aware of the price reduction — is foreclosed by *Johnson Controls, Inc. v. Jay Industries, Inc.*, 459 F.3d 717 (6th Cir. 2006). In that case, Johnson Controls sued its supplier, claiming that it had been overcharged for certain costs related to the packaging of parts for more than four years. However, Johnson Controls did not notify the defendant of the alleged breach until years after the breach began. The court "rejected Johnson Controls's argument that notice is unnecessary if [the defendant] had actual knowledge of the overcharges." *Id.* at 730. It held that "'§ 2-607 'mandate[s] notice regardless [of] whether either or both parties had actual knowledge of breach.'" *Id.* at 730 (quoting *Standard Alliance Industries, Inc. v. Black Clawson Co.*, 587 F.2d 813, 825 (6th Cir. 1978)). It is immaterial in this case, therefore, whether Yazaki knew of the alleged overcharges or not. Johnson Controls was still required to provide notice of the breach under section 2-607(3). The question remains, however, whether Johnson Controls provided notice within a reasonable amount of time.

Taking the facts in the light most favorable to Johnson Controls, Yazaki has not shown as a matter of law when Johnson Controls became aware of the alleged overcharges.

On the second point, Johnson Controls was required to provide notice "within a reasonable time after [it] discover[ed] or *should have discovered* any breach" by Yazaki. Mich. Comp. Laws § 440.2607(3)(a) (emphasis added). Nonetheless, as noted above, Chrysler's change notice did not say there was a price reduction on the wire harnesses supplied by Yazaki. The record does not establish that Chrysler initiated a price reduction to either party. Therefore, although section 2-607(3) applies to the agreements between the parties, it cannot be determined as a matter of law

-14-

whether Johnson Controls failed to provide reasonable notice of the alleged overcharges because it is genuinely disputed whether Johnson Controls discovered or should have discovered the alleged breach by Yazaki.

As noted above, under the terms of the parties' agreements, Johnson Controls may set off amounts owed to it by Yazaki. If there was a price reduction between Yazaki and Chrysler, then it would be entitled to recoup that deficit by withholding payables. However, if the fact finder decides that Johnson Controls knew or should have known about the alleged price reduction because of the change notice or other evidence produced at trial, then section 2-607(3)(a) would bar Johnson Controls from recovery of any sort.

C.

Johnson Controls also contends that section 2-607 does not apply because Yazaki waived all commercial claims against Johnson Controls, including pricing disputes. The parties' agreement indemnifies Johnson Controls against "all commercial issues (including pricing disputes) . . . directly and exclusively with [Chrysler] and [Yazaki] will indemnify and hold harmless [Johnson Controls] for these matters." 2014 Terms ¶ 15(c)(5). As noted above, this provision protects Johnson Controls from commercial claims, such as pricing disputes, *between* Yazaki and Chrysler. The provision does not waive breach of contract claims by Yazaki against Johnson Controls.

D.

Finally, Johnson Controls argues that Yazaki cannot maintain an action for breach of contract against it, because Yazaki committed the first substantial breach. This argument lacks merit. Although under Michigan law, the "one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform," *Flamm v.*

*Scherer*, 40 Mich. App. 1, 8-9 (1972), as noted above, the record does not establish as a matter of law that Yazaki breached any agreement between the parties.

Furthermore, the first to breach rule applies only if the initial breach was "substantial." *Baith v. Knapp-Stiles, Inc.*, 380 Mich. 119, 126, 156 N.W.2d 575 (1968). "A 'substantial breach' is one 'where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party.'" *Jawad v. Hudson City Sav. Bank*, 636 F. App'x 319, 322 (6th Cir. 2016) (quoting *McCarty v. Mercury Metalcraft Co.*, 372 Mich. 567, 127 N.W.2d 340, 343 (1964)). Johnson Controls continued to perform under the parties' agreements, and continued to provide vehicle seats to Chrysler. The alleged overcharges by Yazaki did not render impossible or ineffective Johnson Controls's ability to integrate wire harnesses into seat assemblies for Chrysler. Therefore, the alleged breach was not a substantial breach, and Yazaki would not be barred from bringing a claim of breach of contract even if the evidence eventually shows that it overcharged Johnson Controls.

### III.

Despite the parties' good faith attempt to eliminate factual disputes through their joint stipulation, fact questions remain that preclude summary judgment as a matter of law for either party.

Accordingly, it is **ORDERED** that the motions for summary judgment [dkt. #18, 20, 34] are **DENIED**.

It is further **ORDERED** that counsel for the parties appear for a status conference on **August 2, 2017 at 4:00 p.m.** to discuss further case management issues.

                                              s/David M. Lawson  
                                              DAVID M. LAWSON  
                                              United States District Judge

Dated: July 7, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 7, 2017.

                                s/Susan Pinkowski  
                                SUSAN PINKOWSKI